SIGMA–TAU INDUSTRIE FARMA-
CEUTICHE RIUNITE, S.p.A. and
Biosint, S.p.A., Plaintiffs,

v.

LONZA, LTD., Defendant.

No. Civ. A. 97–0562(JHG).

United States District Court,
District of Columbia.

July 28, 1999.

Jean–Paul Lavalleye, Jeffrey Bayne McIntyre, Christina Miriam Gadiano, Norman F. Oblon, Richard D. Kelley, Catherine B. Richardson, J. Derek Mason, Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, VA, for Sigma–Tau Industrie Farmaceutiche Riunite, S.p.A., Biosint, S.p.A., plaintiffs.

Douglas P. Lobel, Kelley Drye & Warren, LLP, Washington, DC, David Francescani, Joseph Robinson, Maryann Hayes, Bert J. Lewen, James E. Hanft, David R. Francesani, Darby & Darby P.C., New York City, Daniel R. Schechter, Darby & Darby, P.C., New York City, for Lonza, Ltd., defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs, Sigma–Tau Industrie Farmaceutiche Riunite, S.p.A. and its subsidiary Biosint, S.p.A. (collectively "Sigma–Tau"), commenced this action against defendant, Lonza, Ltd. ("Lonza"), for a declaratory judgment of non-infringement and invalidity of United States Patent No. 5,073,376 ("'376 patent" or "Lonza patent"). Currently pending are: (1) plaintiffs' motion for summary judgment on the ground that the '376 patent is unenforceable for inequitable conduct; (2) plaintiffs' motion for summary judgment on the ground that the '376 patent is invalid for failure to disclose the best mode; and (3) plaintiffs' consolidated motion for summary judgment on the grounds that the '376 patent is invalid under 35 U.S.C. § 102(b) and (e).[1] Upon consideration of the entire record in this matter, and for the reasons discussed below, all of the summary judgment motions are denied.[2]

1. Plaintiffs' motion to strike defendant's second amended answer and counterclaim, filed March 30, 1999, remains pending and will be decided after the Court hears from the parties at the status conference to be scheduled for September 29, 1999.

2. Pursuant to Local Rule 108(f), the requests for oral argument are denied as the briefs and

## I. Introduction

On December 17, 1991 the United States Patent and Trademark Office ("PTO") granted the '376 patent to Willibald Kohl and Thomas Scholl. Defendant Lonza is the named assignee. The '376 patent involves a preparation for oral application of a compound known as L-carnitine L-tartrate ("LCLT"). LCLT is "the salt of L-carnitine with L-tartaric acid in the molar ratio of 2:1." Lonza patent at col. 1, lines 51–52. L-carnitine is generally used as a food supplement by athletes for energy and muscle development and as a therapeutic medicine for treatment of metabolic diseases. However, L-carnitine is highly hygroscopic,[3] and products containing L-carnitine normally have to be "produced with the exclusion of moisture and must be packaged hermetically and individually, since they would begin to liquefy in a short time even with the normal moisture in the air." Lonza patent at col. 1, lines 35–39. LCLT, on the other hand, is less hygroscopic than L-carnitine and, "at normal air moisture ($\leq$ 60 percent relative humidity) is stable in storage and can be processed without special precautions." Lonza patent at col. 1, lines 54–57.

## II. Inequitable Conduct Motion

Sigma–Tau has filed a motion for summary judgment on the ground that the '376 patent is unenforceable because of inequitable conduct committed by individuals involved in the prosecution of the patent (collectively "applicants"). Specifically, Sigma–Tau alleges the applicants misled the PTO by withholding contradictory test data, by failing to disclose that crystal size affects hygroscopicity, and by failing to disclose test results showing that

exhibits filed by the parties provide sufficient information for the Court to make her rulings.

3. "Hygroscopic" is defined as "readily absorbing moisture, as from the atmosphere." *Webster's II New Riverside University Dictionary* (1994).

other known salts of L-carnitine were less hygroscopic than LCLT.

## A. Background

The application for the '376 patent was filed on March 27, 1990. On July 3, 1990, the PTO denied the application, stating the invention was obvious in light of Murakami's prior art which combined L-carnitine with other salts for use in powder, tablets and capsules. *See* Mot. for Summ.J. Exh. B–5.[4] The applicants responded to the PTO by stating that Murakami's prior art is a hygroscopic form of L-carnitine that must be "hermetically and individually" packaged, while LCLT, on the contrary, is a "non-hygroscopic and odorless form of L-carnitine, which contains no physiologically unsafe additives ... [and] which can be easily processed." *See id.* The applicants further emphasized it was surprising and unexpected that LCLT lacked the hygroscopic property found in L-carnitine. *See id.*

Included with the applicants' response to the PTO was a declaration from Willibald Kohl, a co-inventor ("Kohl"). Kohl advised the PTO that testing of LCLT revealed no water absorption in a 24–hour period in 32% humidity (L-carnitine revealed 12.3% water absorption under the same condi-

tions), and 0.1% water absorption at 66% humidity (L-carnitine absorbed 67.7%). *See id.* at Exh. B–8. Kohl further noted that orange-flavored LCLT tablets containing fructose [5] did not absorb any water after ten days at 56% relative humidity, and peppermint-flavored LCLT tablets containing mannitol [6] "yielded stable tablets capable of being stored." [7] *See id.*

On October 24, 1990, the PTO again rejected the '376 patent application on the basis that the applicants "failed to show the criticality of the [LCLT] formulation with regard to nonhygroscopicity in comparison with other L-carnitine salts." Mot. for Summ.J. Exh. B–10. The rejection was based on the Cavazza patent '449, which claims the parenteral [8] or oral use of L-carnitine "or a pharmaceutically acceptable salt thereof" to increase the level of high density lipoprotein for vascular development. *See* Kohl Decl. Exh. 11. The Cavazza patent does not name any particular "pharmaceutically acceptable salts" and does not propose a non-hygroscopic version of L-carnitine. The PTO also noted that no data was provided by the applicants demonstrating that other L-carnitine salts did not possess non-hygroscopic properties similar to LCLT. *See* Mot. for Summ.J. Exh. B–10.

---

4. The plaintiff has filed four separate motions in this matter. Any citation reference to a summary judgment motion or opposition refers to the motion addressed in that particular section of this Opinion. For example, a citation "Mot. for Summ.J." in the Inequitable Conduct section of this Opinion refers to the motion for summary judgment on the ground of inequitable conduct.

5. Fructose is a "very sweet sugar ... occurring in many fruits and honey and used as a food preservative and an intravenous nutrient." *Webster's II New Riverside University Dictionary* (1994).

6. Mannitol is "an alcohol ... used as a nutrient and dietary supplement and as the basis of dietetic sweets." *Webster's II New Riverside Dictionary* (1994).

7. This statement is erroneous, however, because Lonza now acknowledges that Kohl confused the test results. The orange fla-

vored tablets contained mannitol, not fructose. It is mannitol, not fructose, that has almost no water absorption at 56% humidity. The peppermint tablets contained fructose, not mannitol, and, while fructose is hygroscopic, LCLT tablets containing fructose still "produced acceptable hygroscopicity results." *See* Kohl Decl. at ¶ 14. This same error is contained on the Lonza patent itself. Kohl claims the "error was not intended" and resulted from confusion regarding composition charts. *See id.* During his deposition, Kohl discussed the fructose and mannitol tests, but did not mention any error. *See* Kohl Dep. at 74:24–75:3; 108:14–24.

8. Parenteral is defined as "taken into the body or administered in a manner other than through the digestive tract, as by intravenous or intramuscular injection." *Webster's II New Riverside University Dictionary* (1994).

The applicants, in response to this second rejection by the PTO, submitted an amendment to the patent application. The applicants first noted that the Cavazza '449 patent does not teach a non-hygroscopic form of L-carnitine. The applicants next pointed to Cavazza patent '039, which discusses the "surprising and unexpected" finding that L-carnitine combined with certain L-carnitine acid salts were non-hygroscopic. *See* Mot. for Summ.J. Exh. B–14 at 8. The applicants noted that Cavazza patent '039 teaches it is not obvious to one ordinarily skilled in the art that any form of L-carnitine would be non-hygroscopic. Thus, the applicants argued, it is equally surprising and unexpected that LCLT would be non-hygroscopic. *See id.* 8–10. The applicants further pointed out that the Cavazza '039 patent "is limited to L-carnitine acid salts (and alkanoyl L-carnitine acid salts)" and that LCLT "is not an acid salt, having 2 moles of L-carnitine per mole of L-tartaric acid." *See id.* at 9. As a result, "different properties would be expected." *See id.* at 10. And, while LCLT is acceptable for use in "health food or sport nutrition," the properties in the Cavazza '039 patent are not so acceptable in light of their toxicity and harmfulness. *See id.* at 11.

Nonetheless, the patent applicants, "in order to further evaluate Patent '039," attempted to compare the hygroscopicity of LCLT with that of citric and lactic acid (two salts mentioned in the Cavazza patent), which are the two closest "relatives" of the tartaric acid used in LCLT. *See id.* at 12. These tests were inconclusive because it was impossible to obtain the materials in solid form to test hygroscopicity. *See id.*

After several additional amendments not at issue here, the patent for LCLT was ultimately granted by the PTO on December 17, 1991. Sigma–Tau argues the patent should be invalidated on the basis that the applicants misled the PTO by failing to give the PTO information tending to contradict the hygroscopicity findings of LCLT, by failing to advise the PTO that crystal size affects hygroscopicity, and by failing to provide data comparing the hygroscopicity of LCLT to that of other L-carnitine products.

### B. Legal Standard

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). "Information is material when there is a substantial likelihood that a reasonable patent examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Id.* at 1179. The elements of materiality and intent to deceive must be established by clear and convincing evidence. *See ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 546 (Fed.Cir. 1998); *LaBounty Mfg., Inc. v. United States Int'l Trade Com'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992). The Court must look to all the surrounding facts and circumstances to decide "whether the [patent] applicant's conduct is so culpable that the patent should not be enforced." *Molins,* 48 F.3d at 1178; *see also LaBounty,* 958 F.2d at 1070.

Because a finding of inequitable conduct requires the Court to determine if the patent applicants had an intent to deceive, summary judgment, while available, is often not appropriate. *See ATD Corp.,* 159 F.3d at 547 ("Although the premises of inequitable conduct require findings based on all the evidence, a procedure that may preclude summary determination, a motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not prevail.") (citations omitted); *Paragon Podiatry Lab., Inc. v. KLM Laboratories,* 984 F.2d 1182, 1190 (Fed.Cir.1993) ("While our precedent urges caution in the grant of summary judgment respecting a defense of

inequitable conduct, summary judgment is not foreclosed."); *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577 (Fed.Cir.1985) (a finding of intent in equitable conduct cases requires the "fact finder to evaluate all the facts and circumstances in each case" and, as such, is "rarely enabled in summary proceedings").

In deciding whether to grant or deny summary judgment, the Court

> must decide whether the evidence respecting culpable intent makes the fact reasonably inferable either way, or whether the evidence is so one-sided that the factual issue of intent may be decided as a matter of law. And, in looking to the record for evidence of a genuine issue respecting intent to deceive the PTO, all of the circumstances, including those indicative of good faith, must be considered. However, merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact.

*Paragon Podiatry Lab.,* 984 F.2d at 1190 (citations omitted).

## C. Inconsistent Test Results

*Applicable Facts*

Relying on a report prepared for Lonza on June 14, 1989 by D. Putzas ("Putzas report"), Sigma–Tau argues the patent applicants failed to advise the PTO of contradictory test results concerning the hygroscopicity of LCLT that the applicants knew existed prior to applying for the patent. Specifically, Sigma–Tau claims two tests in the Putzas report directly contradict Lonza's findings concerning water absorption. The first test revealed

that LCLT combined with fructose maintained 6.87% water absorption after one day at 56% humidity and 21.49% water absorption after one day at 66% humidity. *See id.* at Mot. for Summ.J. Exh. C at 009664. The second test revealed that LCLT combined with mannitol maintained 0.42% water absorption after ten days at 56% humidity and 13.22% water absorption after ten days at 66% humidity. *See id.*

Lonza claims these test results are not contradictory and, even if they were, there remains a factual dispute as to whether non-disclosure to the PTO rises to the level of materiality and intent necessary to invalidate a patent for inequitable conduct. Lonza stresses the PTO only considered whether LCLT, not LCLT combined with sugars, was non-hygroscopic. *See* Marsh Decl. at ¶ 9. Thus, Lonza contends it was not necessary for the applicants to disclose the information concerning the fructose and mannitol results. Moreover, Lonza argues that after accounting for the confusion in the fructose and mannitol charts, the results of the Putzas report are consistent with the information contained in the patent application.[9]

Kohl advised the PTO in his declaration submitted with the patent application, which information is also contained in the Lonza patent itself (assuming the correction for the fructose/mannitol error), that LCLT mixed with mannitol "did not take any water even after ten days" when stored "at a relative humidity of 56%." *See* Mot. for Summ.J.Exh. B–8 at 4. Kohl further stated that LCLT mixed with fructose (again assuming a correction for the fructose/mannitol error) "yielded stable tablets capable of being stored, while tab-

---

9. The Court notes the first disclosure of the "unintentional error" in the translation of the fructose and mannitol charts was contained in Kohl's declaration submitted in connection with this summary judgment motion. This is so despite the long history of the '376 patent application process, and the several months of discovery, including Kohl's deposition, conducted in this case. Nonetheless, for purposes of summary judgment, the Court will interpret the charts in the manner in which the patent applicants claim they intended. It is possible that Kohl's statement in his deposition testimony that the peppermint flavored tablets contained mannitol (not the correct fructose) and the orange flavored tables contained fructose (not the correct mannitol) may be the product of confusion as to which flavored tablet contained which sugar, rather than an intent to mislead.

lets on the basis of L-carnitine, after storage for one week, formed a sticky mass because of water absorption." *See id.* at 5.

The Putzas report concludes that at 56% humidity, all the tablets containing pure L-carnitine absorbed identical quantities of moisture regardless of whether they contained fructose or mannitol. *See* Mot. for Summ.J.Exh. C at 009658. The tablets containing LCLT and mannitol absorbed almost no water at 56% humidity. *See id.* at 009659. The tablets containing LCLT and fructose absorbed almost no water at 32% humidity, absorbed some water at 44% humidity, and "at 56% relative humidity, the water absorption of the tablets containing L-carnitine L-tartrate and fructose is *almost equal* to that of the tablets containing L-carnitine." *See id.* (emphasis added). And, at 66% humidity, "it practically no longer matters whether L-carnitine or [LCLT] is present" in the fructose mixture. *See id.* The report concludes that at "up to 56% relative humidity, [LCLT with fructose] is still much less hygroscopic than untreated carnitine." *See id.* at 009660.

*Discussion*

■ The parties dispute whether a reasonable patent examiner would have considered the information contained in the Putzas report material to the investigation of the '376 patent. The abstract of the '376 patent states its purpose as producing a form of L-carnitine that is suitable for oral administration, is non-hygroscopic, and has better storage capacity. The object of the patented invention "is to make available a nonhygroscopic and odorless form of L-carnitine, which contains no physiologically unsafe additives and which is preferably suitable in particular for producing tablets or capsules." *See* Lonza patent at col. 1, lines 45–48. The applicants disclose as examples "explaining the execution of the invention," the results of the mannitol and fructose tests. *See id.* at col. 2, lines 24–25. According to Kohl, both of the disclosed test results came from the Putzas Report. *See* Kohl Decl. at

¶ 14. Both of these tests support the proposition that LCLT when combined with either mannitol or fructose can be stored without special precautions at normal air moisture of 60% humidity or less. *See id.* at col. 1, lines 54–55; col. 2, lines 15–20; col. 3, lines 40–44.

The Putzas report is not necessarily inconsistent with the information provided by the applicants. With respect to the mannitol test, the Putzas report confirms, at least with respect to the 56% humidity level, the patent's claim that LCLT with mannitol is non-hygroscopic. With respect to the fructose test, the Putzas report confirms that LCLT with fructose is less hygroscopic than L-carnitine at levels of 56% humidity and under. The Putzas report says nothing about the patent's claim that LCLT with fructose is capable of being stored without special precautions.

It is possible that a reasonable patent examiner would find the additional information from the Putzas report to be simply cumulative of that already contained in the Lonza patent and the declarations submitted by Kohl. *See Baxter Int'l v. McGaw, Inc.,* 149 F.3d 1321, 1328 (Fed. Cir.1998) ("A patentee need not cite an otherwise material reference to the PTO if that reference is merely cumulative or is less material than other references already before the examiner."); *Molins,* 48 F.3d at 1179 ("If the information allegedly withheld is not as pertinent as that considered by the examiner, or is merely cumulative to that considered by the examiner, such information is not material."). As Lonza argues,

Neither Lonza nor the Examiner considered the unexpected relative non-hygroscopicity of [LCLT] mixed with sugars (mannitol or fructose) to be the novelty of the '376 patent. Thus, the likelihood is that a reasonable examiner would not have considered the omitted hygroscopicity data ... to be important in decid-

ing whether to allow the ... application to issue as a patent.

Opp. to Mot. for Summ.J. at 18.

As a result, summary judgment is inappropriate because a reasonable fact finder could find for the non-moving party on the issue of whether a reasonable patent examiner would have considered the Putzas report material in deciding whether to allow the '376 patent. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

And, even if the Putzas report was material, summary judgment would be inappropriate on the issue of intent. As noted above, the information contained in the Putzas report is not necessarily contradictory and, in some cases, may even be cumulative. Sigma–Tau makes no specific argument concerning intent, stating only that the applicants knew of the existence of the Putzas report and failed to disclose it. However, it does appear from the record that portions of the Putzas Report, or at least information extracted from the Putzas Report, were made known to the PTO. It is essential in a case such as this, where intent is a necessary element of the claim, for the fact finder to have the opportunity to evaluate the credibility of the parties in connection with the evidence provided in order to meet the clear and convincing evidence standard.

### D. Crystal Size

■ Sigma–Tau claims the patent applicants misled the PTO when they failed to notify the PTO that the hygroscopicity of LCLT is affected by the size of its crystal. Lonza argues this fact is immaterial because it is commonly known that crystal size affects hygroscopicity and, in any event, the difference is negligible. According to Lonza, a reasonable patent examiner would not have considered crystal size

important because crystal size has no effect on the "problem the '376 patent was seeking to solve, i.e., the problem that L-carnitine is highly hygroscopic and unsuitable for processing into dosage forms for enteral applications." *See* Kohl Dec. at ¶ 8–9.

In his declaration to the PTO, Kohl advised that "LCLT forms a crystalline powder which can be easily processed and is particularly suitable for processing with rapidly running machines, since it does not tend to stick together or become lumpy." Mot. for Summ.J.Exh. B–8. In his deposition, Kohl advised that he first became aware crystal size could have an impact on hygroscopicity in 1988. However, Kohl did not state the extent to which crystal size affects hygroscopicity or whether it was relevant to the '376 patent. Kohl now states the effect of crystal size on the patent is "negligible." Kohl Decl. at ¶ 9.[10] There remains a factual dispute as to whether these findings are indeed negligible, and whether the crystal size would have an impact on the '376 patent.

There is also some dispute as to whether the applicants made the unqualified assertion that LCLT is non-hygroscopic. According to Sigma–Tau, the unqualified assertion would necessarily encompass crystal size. In other words, if Lonza claimed that LCLT is completely non-hygroscopic, failure to disclose that some LCLT (depending on crystal size) may be hygroscopic was material and misleading. There is some question, however, as to whether Lonza did in fact make that unqualified assertion and whether the PTO believed it to be unqualified. For example, in one document, the PTO noted that the experimental data provided by Kohl shows that LCLT "displays less water absorption than the L-carnitine free base." Mot. for Summ.J. at Exh. B–10. It is possi-

---

**10.** Kohl points to a study done in 1991 showing "6% hygroscopicity for fine crystals, 2.6% for medium crystals and 1.5% for course [sic?] crystals" at a 66% relative humidity over a 24 hour period. Kohl Decl. at ¶ 9.

These results appear to be more than negligible, however, they were done at the 66% humidity level. The test results say nothing about the effect of crystal size at humidity levels of 60% and lower.

ble that the PTO did not understand the patent as being completely non-hygroscopic, just less hygroscopic. Thus, there remains a factual issue as to whether the patent applicants intended to show that LCLT was completely non-hygroscopic, without qualification, or that it was less hygroscopic than L-carnitine and capable of being packaged for its intended oral use. As a result, it is unclear to what extent, if any, the crystal size affects the Lonza patent's claims and, as a consequence, whether a reasonable patent examiner would have found crystal size material.

Moreover, Sigma–Tau fails to provide specific evidence of intent to deceive. While Kohl acknowledged being aware in 1988 that crystal size affects hygroscopicity, this in and of itself does not necessarily prove either that crystal size was material or that information concerning crystal size was intentionally withheld from the PTO.

### E. Hygroscopicity in Comparison to Other L–Carnitine Salts

#### Applicable Facts

Sigma–Tau argues that Lonza failed to disclose known tests of properties that were less hygroscopic than LCLT despite the PTO's request for such information. According to Sigma–Tau, when Lonza disclosed the results of hygroscopicity tests of citric acid and lactic acid, it knew that L-carnitine combined with fumaric acid and L-carnitine combined with adipic acid were less hygroscopic than LCLT. On August 8, 1988, Lonza conducted various tests aimed "at lowering the hygroscopicity" of L-carnitine. The tests involved combining L-carnitine with fumaric acid, adipic acid, and tartaric acid (which was ultimately used in the '376 patent). The report con-

cluded the samples containing fumaric acid and adipic acid were non-hygroscopic at humidity levels up to 80%. Mot. for Summ.J.Exh. D at 008972. However, the fumaric and adipic acid samples showed some "clumping," while the samples with tartaric acid remained "powdery" at 55% humidity. Id.

In a September 23, 1988 internal memorandum, Lonza stated its objective of "synthesiz[ing] a carnitine derivative that does not absorb water, remains free-flowing in air [i.e., does not clump] and therefore can be readily processed, is not protected by patent, and is permissible in foods." Mot. for Summ.J.Exh. E (emphasis added). Lonza concluded that since the L-carnitine with fumarate was "patented by Sigma–Tau, [it] was left with the hydrogen adipate and the tartrate." Id. In a report dated May 30, 1990, Lonza concluded that the least hygroscopic alternative to L-carnitine was fumarate, with tartrate being the second best option. See Mot. for Summ.J.Exh. H at 012848.[11] See id.

After the PTO denied the Lonza patent application based, in part, on the applicants' failure to demonstrate that other L-carnitine properties were not hygroscopic, the applicants' attorney, Virgil Marsh ("Marsh"), suggested the applicants perform some hygroscopicity tests on the "closest pharmaceutically-acceptable salts of L-carnitine" listed in the Cavazza '039 patent.[12] See Kohl Decl.Exh. 12. Marsh apparently believed this was the type of data the PTO sought. See Marsh Decl. at ¶ 6.

The tartaric acid used in LCLT is a hydroxy acid, an acceptable food additive. Lonza claims it chose to test the citric and lactic acids because they were the closest

---

11. The 1990 report also contains a notation that the L-carnitine L-tartrate could not be patented because it "has been described in the literature by STRACK [1] in 1972." Mot. for Summ.J.Exh. H at 012848. Lonza addressed this concern in March 1991 by noting that the STRACK literature does not teach that L-carnitine L-tartrate is "non-hygroscop-

ic or useful for preparations for enteral application." Opp. to Mot. for Summ.J.Exh. 14 at 013777.

12. Sigma–Tau makes no claim for inequitable conduct against Marsh. See Reply to Opp. to Mot. for Summ.J. at 1, n. 2.

food acceptable hydroxy acid. Adipic and fumaric acids, on the other hand, are "chemically synthesized acids which are considered chemicals, whereas L-tartaric acid is derived as a natural by-product of wine-making and is widely accepted by health conscious customers." Kohl Decl. at ¶ 19. Moreover, the fumaric and adipic acids have "low acceptable daily intake" as opposed to LCLT, which can be consumed in amounts five to six times higher than L-carnitine with fumaric or adipic acids. *See id.*

Sigma–Tau claims the patent examiner did not request data for "food additive acceptable salts" but rather requested information for all salts. The patent examiner appears to have requested information regarding "other L-carnitine salts." *See* Mot. for Summ.J.Exh. B–10. There is some question as to whether this meant the patent examiner required data on every L-carnitine salt available. Marsh, after reviewing the PTO's request, suggested to Lonza the salts from the Cavazza '039 patent would be appropriate to test and disclose to the PTO. *See* Marsh Decl. at ¶ 5. Moreover, the PTO had data available from the '039 Cavazza patent showing the non-hygroscopicity of some L-carnitine salts, including fumarate. However, as Sigma–Tau points out, the '039 salts were compared to free L-carnitine and not LCLT.

*Discussion*

▉ Whether a reasonable patent examiner would have considered the information on adipic or fumaric acids material depends on the scope of the patent examiner's inquiry when she requested additional information on the Lonza patent application. For example, was the patent examiner looking for products that were more hygroscopic than LCLT or was the examiner simply delving into the question of whether a person skilled in the art would have found it surprising that LCLT was hygroscopic? The point of the patent is a non-hygroscopic version of L-carnitine in a molar ratio of 2:1 suitable for oral use in capsule, tablet, or powder form. Thus, a reasonable patent examiner would find it material if other forms of L-carnitine already achieved this purpose. Lonza claims the only material that may have been suited for this purpose—the citric and lactic acids—were unable to be tested for hygroscopicity. The parties dispute whether fumaric or adipic acid, allegedly not acceptable food substitutes, were indeed suitable for the purpose of the '376 patent, and thus within the scope of the patent examiner's request even under Lonza's narrow interpretation.

In his deposition, Kohl stated he previously made a list of food additives. He recalled that he put fumaric and adipic acids on that list. However, it is unclear whether Kohl made that list before or after his declaration to the PTO, or whether he inadvertently listed fumaric and adipic acids as food additives. Kohl claims that fumaric and adipic acids are not food additives and are not acceptable for the purpose of the '376 patent. In any event, the deposition by itself does not indicate an intent to deceive the PTO. Rather, it leaves open the question of what Kohl meant when he indicated that fumaric and adipic acids were food additives, and whether he believed this to be the case at the time he made his declaration to the PTO. Intent to deceive requires a high level of proof, and the deposition testimony, by itself, does not unequivocally establish such intent. Summary judgment on the issue of inequitable conduct is denied.

### III. Best Mode Motion

Sigma–Tau claims the '376 patent is invalid because Kohl knew of and failed to disclose a drying method that constituted the best mode for practicing the patented invention. Lonza claims that Kohl did not contemplate one particular dryer as the best mode because he successfully used several types of dryers prior to filing the Lonza patent application. Moreover, Lonza claims the drying process is a non-essential characteristic of the '376 patent and any person skilled in the art would be

able to practice the patent, including the drying step, without undue experimentation.

## A. Background

The patent provides examples which "explain the execution of the invention." Lonza patent, col. 2, lines 24–25. The drying procedure is mentioned in Example 1:

> L-tartaric acid was dissolved in the required quantity of hot 90 percent aqueous ethanol, the calculated quantity of L-carnitine was added, the salt was brought to crystallization by cooling, filtered and dried.

Lonza patent, col. 2, lines 30–33. The patent does not require a specific type of dryer, nor does it require a specific procedure for drying the LCLT.

Drying is a necessary step in obtaining LCLT crystals which can be processed into tablets, capsules and other forms of oral use as stated in the '376 patent. The object is to obtain crystal particles that are easy to process into such oral dosages. These crystals should have "flowability," in that they flow through the machines and do not clump or stick to each other or the equipment. See Kohl Dep. at 62:16–63:4. Flowability may be affected if the crystals are broken down into fine material. See id. at 67:9–68:8. This is called a "milling effect." See Dettwiler Dep. at 29:1–10. The parties dispute the effect, if any, drying has on flowability and whether certain

dryers are better suited to producing the patented product.

Lonza claims the only dryers it used before filing the patent application [13] were a fluidized bed spray dryer and a paddle dryer, and that both of these dryers successfully produced LCLT capable of processing into oral dosages.[14] See Kohl Decl. at ¶ 8–10. Lonza currently uses a double-cone dryer, however, it did not use this type of dryer either at the time it filed its Swiss application, or at the time it filed its application in the United States.[15] Lonza states that it chose dryer type based on availability, not preference of one dryer over another.

Sigma–Tau claims that Kohl knew the double-cone dryer yielded the best results and failed to disclose it as the best mode and, even if the double-cone dryer was not used prior to the application filing date, Lonza nevertheless experimented with various types of dryers and knew that some dryers yielded better results than others.

## B. Legal Standard

▮ A patent specification must contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best

13. The application for the '376 patent was filed with the PTO on March 27, 1990. The application was granted priority under 35 U.S.C. § 119 based on a similar application filed in Switzerland on December 22, 1989. In conducting a best mode inquiry, the Court determines what was disclosed as of the date of the filing of the foreign patent application. See Transco Prod., Inc. v. Performance Contracting, Inc., 38 F.3d 551, 560 (Fed.Cir. 1994). Unless otherwise noted, any reference to the patent filing date is to the December 22 filing of the Swiss application.

14. A paddle dryer is a heated tube containing moving paddles that turn and rotate the material within the tube. See Dettwiler Dep. at 26:18–24. It is not clear from the information provided how a fluidized bed spray dryer operates, but it apparently involves the placing of material in a high temperature tower and spraying a water solution which causes the water to evaporate and the material to dry. See Dettwiler Dep. at 39:21–25; 50:1–11.

15. A double-cone dryer is a double cone with heated walls. Material rotates within the cone and is dried by the heat emanating from the walls. See Dettwiler Dep. at 27:2–6.

mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. The best mode requirement "looks to whether specific instrumentalities and techniques have been developed by the inventor and [were] known to him at the time of the filing as the best way of carrying out the invention." *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043, 1050 (Fed.Cir.1995). A patent may be invalidated if it is proved by clear and convincing evidence that the inventor knew of and concealed the best mode for practicing the invention. *See Transco Products, Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 560 (Fed.Cir.1994). In order to determine compliance with the best mode requirement, the Court first conducts a subjective inquiry into whether the "inventor knew of a mode of practicing the claimed invention that he considered to be better than any other at the time he filed his application." *Id.* If the inventor did, in fact, consider a best mode, the second step is an objective inquiry to determine whether the best mode was disclosed in a manner sufficient "to enable one skilled in the art to practice the best mode." *Id.* "[T]o satisfy the second inquiry of the best mode test, an inventor need only disclose information about the best mode that would not have been apparent to one of ordinary skill in the art." *Young Dental Mfg. Co., Inc. v. Q3 Special Prod., Inc.*, 112 F.3d 1137, 1144 (Fed.Cir.1997). Routine details are apparent to one skilled in the art and need not be disclosed. *See id.*

## C. Discussion

### Whether The Inventors Contemplated a Best Mode

■ Several deposition transcripts, affidavits and exhibits were included in the briefs filed by the parties. Considering this evidence *in toto*, the Court finds that there is a genuine issue of material fact such that a reasonable fact-finder could decide for the non-moving party on the issue of whether Kohl knew of and failed to disclose the best mode of drying the LCLT. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the evidence appears to favor Sigma–Tau's position, it is not one-sided and sufficient disagreements are present such that the issue is properly submitted to the fact-finder. *See id.* at 251, 106 S.Ct. 2505. The deposition testimony and declarations of the various witnesses in the case are illustrative.

### 1. Hansruedi Dettwiler

Hansruedi Dettwiler ("Dettwiler") is the head of the development department for organic chemicals at Lonza. Dettwiler testified in depositions that Lonza used both paddle dryers and double-cone dryers to produce LCLT during 1989–91. *See* Dettwiler Dep. at 27:7–25. He does not state, however, what dryers were used at the time the Swiss patent application was filed on December 1989, or at the time the United States patent was filed in March, 1990. Dettwiler testified that in a laboratory unconcerned with crystal size of the material, there was no difference between using a double-cone dryer or a paddle dryer. *See id.* at 27:14–15. In fact, according to Dettwiler, the decision was based solely on dryer availability. *See id.* at 27:12–15. Dettwiler acknowledged, however, that the paddle dryer had "some milling effect," and the double-cone dryer did not. *See id.* at 29:1:–30:18. Dettwiler does not state whether the double-cone dryer was used prior to the filing of the patent application, whether Kohl was aware of the milling effect of the paddle dryer or the non-milling effect of the double-cone dryer, or whether either of these dryers impeded the ability to practice the '376 patent.

Dettwiler also indicated that fluidized bed spray drying was used at the testing stage, but was not used on an industrial scale to produce LCLT because there was "some lumping from the material in the drums when you store it over a long time." *See id.* at 58:1–22. The lumping did not occur with the double-cone dryers. *See id.*

at 58:23–25. Dettwiler was unable to say whether fluidized bed spray drying influenced the particle size of LCLT. *See id.* at 50:21–51:6.

Kohl states that all dryers tested, including the paddle dryer and the fluidized bed spray dryer, produced LCLT suitable for the patent's purpose, *see* Kohl Decl. at ¶ 10. Assuming Kohl knew of Dettwiler's conclusions concerning the milling effect of the paddle dryer and the clumping effect of the fluidized bed sprayer dryer, there remains a factual dispute as to whether these particular dryers were unsuitable for practicing the patent in question.[16]

Dettwiler stated only that the LCLT material becomes lumpy after drying in a fluidized bed spray dryer when it is stored in the drums for a "long time." Dettwiler does not say what drums he is referring to, how long a storage time is at issue, and whether or not the use of this type of dryer is an impediment to carrying out the claimed invention. Kohl, in both his deposition testimony and in his declaration, states that at the time he filed the patent application, the patent's objective could be obtained with a fluidized bed spray dryer. *See* Kohl Decl. at ¶ 8; Kohl Dep. at 159:25–160:1–11.[17]

## 2. Willibald Kohl

Lonza relies in great part on the fact that Kohl stated in his deposition there were plenty of dryers on the market and he needed a "careful dryer" that "would not break down the crystals too much." Kohl Dep. at 66:7–11; 66:23–25. Kohl further stated in his deposition he was aware dryers such as shelf dryers and rotating dryers did not cause crystal breakdown. *See id.* at 67:9–11. However, he explains in his declaration that because these

dryers were not used by Lonza he could not have contemplated them to be the best mode of drying the product. *See* Kohl Decl. at ¶ 11.

Kohl further acknowledged in his deposition that at the time he filed his application he was aware that some types of dryers might break down crystals, but he did not indicate which dryers did so. *See* Kohl Dep. at 67:12–22. In his declaration, Kohl explains he was just stating a proposition that is well known in his field. *See* Kohl Decl. at ¶ 12. If it is indeed well known in the industry that some dryers create a milling effect and impede flowability, then the fact that there are some dryers on the market that cause this problem does not necessarily mean that Kohl considered all of them and selected the best one as a preferred method, or even that he had to disclose the existence of these dryers. As the Federal Circuit has noted, "[a] patent need not teach, and preferably omits, what is well known in the art." *Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1534 (Fed.Cir.1987).

## 3. Deposition of Christopher Rhodes

Although unclear from the briefs and exhibits submitted, the Court presumes Christopher Rhodes ("Rhodes") was retained by Sigma–Tau as an expert in this case. Rhodes testified in his deposition that by failing to specify any particular dryer or drying method, Lonza omitted "essential, practical detail which would allow one skilled in the art to apply the invention without difficulty." Rhodes Dep. at 93:2–5.

Rhodes does not say, however, whether he tested various methods for drying, or whether he knows of a particular method

**16.** *See Glaxo, Inc. v. Novopharm, Ltd.,* 52 F.3d 1043, 1049–51 (Fed.Cir.1995) (knowledge of best mode cannot be imputed to inventor solely on the basis of what others know).

**17.** Kohl reaches this conclusion despite his awareness of Lonza memoranda recommending more testing of LCLT on the basis that the fluidized bed spray drying may produce sticky

crystals. *See* Kohl Dep. at 159:12–160:11; Mot. for Summ.J. Exhs. J and K. Kohl claims the additional tests "showed that carnitine tartrate, acceptable for commercial use, could either be made by crystallization process or also a [fluidized bed] spray drying process". *See* Kohl Dep. at 160:1–11.

that will best enable one to practice the '376 patent. He indicates that if he were practicing the '376 patent, he might attempt to use, or at least think about using, a tray dryer, a rotary dryer, or a spray dryer.[18] *See id.* at 117:3–9. There is nothing to indicate these dryers would or would not enable one skilled in the art to practice the '376 patent. Rhodes speculates that if he sat down and looked at all the variables, he might find that a "significant number of [dryers] would work" and that "an even more significant number would not work." *See id.* at 170:9–16–17. Rhodes' testimony leaves open many factual questions as to whether one skilled in the art can practice the '376 patent without the disclosure of a specific drying method.

### 4. Declaration and Deposition of Arthur H. Goldberg

Arthur H. Goldberg ("Goldberg") was retained as an expert by Lonza. *See* Goldberg Decl. at ¶ 2. He disputes Rhodes' conclusions. Goldberg claims that any standard dryer could dry the LCLT to a sufficient degree and that drying LCLT "does not present any unusual problems." *Id.* at ¶ 43. In fact, according to Goldberg, "[n]o matter how the [LCLT] is processed for commercial quantities, if the teaching of the '376 patent is followed, it will always result in [LCLT] with a hygroscopicity sufficiently low to permit processing into solid dosage forms." *Id.* at ¶ 44. Goldberg states the type of dryer used "most frequently [ ] does not" have an impact on the particle size of the product. *See* Goldberg Dep. at 131:1–5. He noted that nonstatic dryers, such as spray dryers and fluidized bed dryers, would have "no effect or very little effect on particle size." *Id.* at 131:14–132:10. Static dryers, such as "tray dryers, paddle dryers, drum dryers, cone dryers, and double-cone dryers," "*may* have an effect on particle size." *Id.* at 131:14–121:2 (emphasis added).

After considering all of this evidence, as well as other evidence submitted by the parties, the Court concludes there remains a genuine issue of material fact as to whether there is a best mode for drying LCLT and whether Kohl contemplated this best mode at the time he filed his patent application.

### Whether There Was Sufficient Disclosure

The Court need not reach the second part of the best mode test if she concludes there remains a factual dispute as to whether Kohl contemplated a best mode for drying the LCLT. *See Transco,* 38 F.3d at 560. However, even if the Court established that Kohl contemplated a specific type of dryer as the best mode, a factual dispute would remain as to whether the drying process in this context is so routine as to preclude the disclosure requirement. *See Young Dental Mfg. Co.,* 112 F.3d at 1144. This dispute is evidenced by the opposite positions taken by Rhodes and Goldberg regarding whether the drying process has been disclosed in "sufficient detail to allow a skilled artisan to practice it without undue experimentation." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1064 (Fed.Cir. 1998).

Rhodes claims that without specifics on the drying process, practicing the patent may be a "horrendous task" that could take a very long time. *See id.* at 118:6–7; 120:8–14. Goldberg states, to the contrary, that "[to] the extent that any methods or specific processing parameters are not disclosed in the '376 patent, it would be clear to one skilled in the art how to arrive at such methods and parameters without undue experimentation." Goldberg Decl. at ¶ 41. Thus, even if the Court deemed summary judgment appropriate on the issue of contemplation, there would remain a factual dispute on the issue of disclosure.

---

**18.** In fact, in what seems to contradict some evidence submitted regarding spray drying, Rhodes notes that "with spray drying we tend to get nice round particles which very often are *easy to process.*" *Id.* at 97:24–98:1 (emphasis added).

Summary judgment on the best mode issue is denied.

## IV. Consolidated Motion To Declare '376 Patent Invalid Under 35 U.S.C. § 102

Sigma–Tau has filed a consolidated motion for summary judgment alleging that the '376 patent is invalid under 35 U.S.C. § 102(e) because the invention claimed in the '376 patent was described and anticipated in United States patent number 4,968,517 ("Gergely U.S. patent") and United States patent number 5,030,657 ("Georgia patent") before Lonza filed its patent application. Sigma–Tau also asserts that the '376 patent is invalid under 35 U.S.C. § 102(b) because its invention was described and anticipated in German patent number DE 36 35 864 A1 ("Gergely German patent") more than one year prior to the date of Lonza's patent application. Lonza claims that neither the Gergely patents nor the Georgia patent could have described or anticipated the '376 patent because neither Gergely nor Georgia teach that the salt of L-carnitine can be combined with L-tartrate in the 2:1 molar ratio to produce a non-hygroscopic form of tablets, capsules or powder for oral application. In addition, Lonza claims that it is entitled to priority over the Georgia patent because the '376 patent was reduced to practice in the United States prior to the filing of the Georgia patent. For the reasons discussed below, Sigma–Tau's motion is denied.

### A. Standard

■ All patents are presumed valid. *See* 35 U.S.C. § 282; *Intel Corp. v. U.S. Int'l Trade Com'n*, 946 F.2d 821, 834 (Fed. Cir.1991); *Orthokinetics v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir. 1986). This statutory presumption can be overcome only by clear and convincing evidence that the patent is invalid. *See Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir. 1993); *Intel*, 946 F.2d at 834. "To be clear and convincing, the evidence must produce a firm belief or conviction that the matter

sought to be established is highly probable and free from serious doubt. The validity of a patent may be upheld solely on the failure of the challenger's evidence to convincingly establish the contrary." *Maxwell v. K Mart Corp.*, 880 F.Supp. 1323, 1329 (D.Minn.1995) (*citing Orthokinetics*, 806 F.2d at 1570).

### Anticipation

One way to assert invalidity of a patent is to claim the invention was anticipated or described in prior art. A person is not entitled to a patent if

> the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or ...

> the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent. . . .

35 U.S.C. §§ 102(b) and 102(e), respectively.

■ A party asserting under 35 U.S.C. § 102 that a patented invention was anticipated must show identity of invention. "Identity of invention is a question of fact, and one who seeks such a finding must show that each element of the claim in issue is found, either expressly, or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed.Cir.1992). Thus, in order to have the '376 patent declared invalid as having been anticipated by either the Gergely or Georgia patents, Sigma–Tau must show by clear and convincing evidence that each and every element of the '376 patent was disclosed either expressly or under principles of inherency in either the Gergely or the Georgia pat-

ents. *See Ferag AG v. Grapha–Holding AG*, 905 F.Supp. 1, 4 (D.D.C.1995); *see also SSIH Equip. S.A. v. United States Intern. Trade Com'n*, 718 F.2d 365, 377 (Fed.Cir.1983); *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984).

*Inherency*

■ Under principles of inherency, prior art can be deemed anticipatory if, as a matter of scientific fact, an unstated element contained in the anticipating reference flows naturally from the elements expressly disclosed. *See Hughes Aircraft Co. v. U.S.*, 8 U.S.P.Q.2d 1580, 1583, 15 Cl.Ct. 267 (1988). In other words, if the Gergely patent inherently discloses the invention of the '376 patent, one skilled in the art could produce the results claimed in the '376 patent simply by practicing the Gergely patent, *i.e.*, the result flows naturally from the express disclosures of the Gergely patent whether or not others are aware of it *Id.; see also Verdegaal Bros. v. Union Oil*, 814 F.2d 628, 633 (Fed.Cir. 1987).

*Reduction to Practice*

■ A patent will not be declared invalid on the basis of an anticipation if the anticipating art does not have priority of invention. A person is entitled to a patent unless

> before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g).

■ "Priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998). Reduction to practice can be constructive, *i.e.*, by filing the patent application, or actual. "In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the [prior art]; and (2) he determined that the invention would work for its intended purpose." *Id.*

■ A date of invention cannot be established "by reference to knowledge, or use thereof, or other activity with respect thereto, in a foreign country." 35 U.S.C. § 102. However, an invention that is conceived and reduced to practice in a foreign country may claim priority of invention if the completed product was introduced in the United States prior to the introduction of the prior art. *See Holmwood v. Sugavanam*, 948 F.2d 1236, 1238 (Fed.Cir. 1991); *Maxwell*, 880 F.Supp. at 1334.

■ An actual reduction to practice may not be established on the inventor's testimony alone. Rather, the inventor's testimony must be corroborated by independent evidence. *See Price*, 988 F.2d at 1194; *Holmwood*, 948 F.2d at 1239. A rule of reason analysis, a consideration of all pertinent evidence, is applied to determine if the inventor's testimony has been sufficiently corroborated. *See Price*, 988 F.2d at 1195.

## B. Georgia Patent

*The Patent*

On October 23, 1989, Gary J. Burtle, G. Larry Newton, and Stephen A. Blum filed an application for a patent entitled "L–Carnitine Supplemented Catfish Diet." The patent was issued December 9, 1991, and was assigned to the University of Georgia Research Foundation of Athens,

Georgia and Lonza, Inc. of Fair Lawn, New Jersey.[19]

The Georgia patent states L-carnitine can be used in fish feed to improve the growth and survival of catfish. *See* Georgia patent, col. 3, lines 45–64. "Catfish are generally fed manually by broadcasting feed across the surface of the water, or automatically from mechanical feeders." *Id.* at col. 5, lines 20–22. The fish feed is "usually prepared by uniformly mixing the ingredients [for the feed], including L-carnitine, and then either extruding or pelleting the mix.[20] Extruding feeds float. Pelleted feeds sink." *Id.* at col. 5, lines 36–39. L-carnitine is soluble, however, and its presence causes the feed to leach into the water.[21] *Id.* at col. 6, lines 21–24.

The Georgia patent was designed to reduce the leaching effect of L-carnitine in catfish feed. *See id.* at col. 3, lines 51–55. Claims 1 through 3 of the patent teach a composition comprising catfish feed containing L-carnitine in certain portions not relevant here. *See id.* at col 9, lines 28–36. Claim 4 teaches the use of "binders and encapsulating agents to decrease solubility of the L-carnitine in the feed composition." *Id.* at col. 9, lines 43–45. Claims 5 through 7 teach the composition in pelleted, extruded, and microencapsulated form. *Id.* at col. 9, lines 46–49. Claim 8 teaches L-carnitine in a form selected from a group consisting of, among other things, L-tartrate carnitine. *Id.* at col. 9, lines 50–55. Claims 14 and 15 teach the compositions in this group, including L-tartrate carnitine, are deemed to be forms of L-carnitine with "decreased solubility in water." *Id.* at col. 10, lines 13–21. Other relevant claims are

Claim 11, which teaches a "feed composition by mixing dry materials with moisture and the L-carnitine and extruding the mixture," Claim 12, which teaches "mixing the dry materials with the L-carnitine and pelleting the mixture," and Claim 13, which teaches "encapsulating the L-carnitine in the feed composition to decrease the solubility in water." *See id.* at col. 10, lines 4–12. The patent also describes the L-carnitine being combined with other vitamins and minerals to make a "complete fish feed." *See id.* at col. 4, lines 30–67.

*The '376 Patent*

The '376 patent has ten claims involving the preparation of LCLT for oral use. Claim 1 teaches

A preparation for enteral [oral] application comprising at least one tablet composed of the salt of L-carnitine with L-tartaric acid [L-tartrate] in the molar ratio of 2:1, powder composed of the salt of L-carnitine with L-tartaric acid in the molar ratio of 2:1 or at least one capsule containing the salt of L-carnitine with L-tartaric acid in the molar ratio of 2:1.

*See* '376 Patent col. 4, lines 27–33. Claim 2 teaches the use of adjuvants (additives) such as amino acids and binding agents to make tablets, capsules and powder suitable for oral administration. *See id.,* col. 4, lines 34–42. Claims 3 and 4 teach adding sugar additives to LCLT to form a tablet. *See id.,* col. 4, lines 43–47. Claims 5 and 6 teach a preparation for LCLT in powder form and capsule form. *See id.,* col. 4, lines 48–51. Claims 2–6 are dependent on Claim 1. Claim 7 teaches a preparation for oral administration being composed of

**19.** Lonza, Inc. is "the United States affiliate of ... Lonza, A.G., both companies being owned by a common parent." Kohl Decl. at ¶ 12; Terranova Decl. at ¶ 2. The parties do not dispute that Lonza, A.G. and Lonza, Inc. are different entities for purposes of Sigma–Tau's § 102 claims.

**20.** "Extrude" is defined as "to push or thrust out; to shape (e.g., metal or plastic) by forcing through a die." "Pellet" is defined as "a small solid or densely packed ball or mass, as of bread, wax, or medicine; a bullet or piece

of small shot." *Webster's II New Riverside University Dictionary* (1994).

**21.** "Leaching" is defined as "to remove soluble constituents from by the action of a percolating liquid." "Soluble" is defined as "capable of being dissolved." "Percolating" is defined as "to cause (liquid, powder, or small particles) to pass through a porous substance or small holes." *Webster's II New Riverside University Dictionary* (1994).

LCLT in the 2:1 molar ratio. *See id.* at col 4, lines 52–56. Claims 8 and 9, which are dependent on Claim 7, teach the placement of LCLT in capsules and tablets. *See id.*, col. 4, lines 57–64. Claim 10 teaches the oral consumption of the LCLT described in Claim 1 by a human. *See id.*, col. 4, lines 65–66.

### Anticipation

Sigma–Tau claims the Georgia patent anticipates the invention of the '376 patent. Specifically, Sigma–Tau argues the Georgia patent describes the claims in the '376 patent involving (1) a preparation for enteral (oral) application, (2) a form of administration, (3) the use of L-carnitine L-tartrate in the 2:1 molar ratio (LCLT), and (4) the use of additives and additional ingredients.

Lonza states the Georgia patent does not describe the '376 patent because the Georgia patent "neither recognizes nor provides sufficient disclosure for one skilled in the art to solve problems identified and resolved by the '376 patent, namely, producing non-hygroscopic [LCLT] in a tablet, capsule or powder form." Opp. to Mot. for Summ.J. at 14. Lonza principally relies on the declaration of its expert, Arthur Goldberg ("Goldberg"). Goldberg states the goal of the '376 patent was to make a non-hygroscopic form of L-carnitine that would be suitable for oral application in the form of tablets, capsules or powder, and that would be food acceptable, tasty and odorless. The inventors of the Georgia patent, on the other hand, had an entirely different goal. According to Goldberg, the Georgia patent sought to prevent leaching by reducing the water solubility of L-carnitine by various methods, some of which included microencapsulating, adding binders or other ingredients, or using other forms of L-carnitine, including L-tartrate carnitine. Goldberg states the Georgia patent does not anticipate the '376 invention because a person of ordinary skill in the art would not consider the L-tartrate carnitine mentioned in the Georgia patent to be LCLT, but instead a salt formed by reacting L-tartrate with both D-carnitine and L-carnitine. *See* Goldberg Decl. at ¶ 17. D-carnitine apparently has no "pharmacologically redeeming value." *See* Goldberg Decl. at ¶ 6.

### L-tartrate carnitine

Kohl's deposition testimony supports the position of Goldberg that LCLT and L-tartrate carnitine are two different compounds. Kohl states the term L-tartrate carnitine "from a chemical viewpoint would mean to me natural tartaric acid combined with D–L carnitine." Kohl Dep. at 57:12–15. In other words, the L-tartrate carnitine substance would contain some part D-carnitine and some part L-carnitine. *See id.*

Moreover, Sigma–Tau's expert, Stephen R. Byrn ("Byrn"), states "[o]ne skilled in the art would know that the phrase L-tartrate carnitine would indicate a compound containing both the D and the L forms of carnitine." Byrn Decl. at ¶ 6. Byrn notes that this compound would include L-carnitine L-tartrate. Byrn Decl. at ¶ 6. However, in a declaration submitted with the motion concerning the Gergely patents ("Byrn March Decl."), Byrn retreats from this position somewhat and notes that to "one familiar with the prior art literature" the term L-carnitine tartrate would mean the compound L-carnitine L-tartrate in the 2:1 molar ratio. *See* Byrn March Decl. at ¶ 17.

However, Sigma–Tau's employee, Paolo DeWitt Scalfaro ("Scalfaro"), claims that because the Georgia patent discusses only L-carnitine, the reference to L-tartrate carnitine can only mean the inclusion of L-carnitine and not D-carnitine. *See* Scalfaro Dep. at 236:3–237:25. Scalfaro further notes that although not specifically explained in the Georgia patent, a reference to "carnitine tartrate" means two molecules of carnitine and one molecule of tartrate. *See* Scalfaro Dep. 238:1–9. Maria Ornella Tinti ("Tinti"), a chemical research manager at Sigma–Tau, also disputes that L-tartrate carnitine is a compound consist-

ing of L-tartrate with both D and L carnitine. Tinti states that "the term L-tartrate carnitine used in [the Georgia patent] refers to the salt of L-carnitine with L-tartaric acid in the molar ratio of 2:1." Tinti Decl. at ¶ 3.

 Although the scales may be tipped somewhat in Sigma–Tau's favor, there is still a disagreement among the witnesses concerning whether the L-tartrate carnitine mentioned in the Georgia patent discloses the LCLT compound claimed in the Sigma–Tau patent. The witnesses also disagree on whether the water solubility/leaching addressed in the Georgia patent would encompass the hygroscopity addressed in the '376 patent, whether pelleting and microencapsulating addressed in the Georgia patent would encompass the capsules and tablets addressed in the '376 patent, and whether the proteins and other additives listed in the Georgia patent would encompass the carbohydrates and sugars included in the '376 patent. This appears to be a situation where summary judgment is not appropriate because the Court needs expert testimony "to explain the nature of the patented invention or the accused product or to assist in their comparison." *Amhil Enterprises, Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1557–58 (Fed.Cir.1996); *see also Vermont Structural Slate Co. v. Tatko Bros. Slate Co.*, 233 F.2d 9, 10 (2d Cir.1956) (summary judgment not appropriate when expert testimony is needed to "make it plain that the differences between the prior art and the patent claims were obvious to persons having ordinary skill in the trade at the time the alleged invention was made").[22]

**22.** Because the Court has denied summary judgment on the issue of anticipation, there is no need to reach the reduction to practice issue. Lonza asserts reduction to practice as a defense to Sigma–Tau's anticipation claim on the basis that Kohl allegedly brought the product of the '376 patent to the United States and showed it to the director of marketing at Lonza, Inc. in Fair Lawn, New Jersey, approximately twenty days prior to the filing of the Georgia patent. Sigma–Tau has

## C. Gergely Patent

### The Patents

On October 22, 1986, Gerhard Gergely, Irmgard Gergely, Thomas Gergely, and Rudiger Wolf filed an application in Germany for a patent describing a method for producing effervescent powder by combining L-carnitine with certain edible organic acids, particularly citric acid ("Gergely German patent"). The application says nothing specific about tartaric acid, although the parties agree that tartaric acid is considered an edible organic acid. The Gergely German patent was published by the German patent office and the Patent Cooperation Office on May 5, 1988. *See* Mot. for Summ.J. at 9.

On August 16, 1988 the Gergelys and Mr. Wolf filed an application for a United States patent describing a method for "combining an edible organic acid" with L-carnitine to form an effervescent powder ("Gergely U.S. patent"). *See* Gergely U.S.Patent, col. 3, lines 4–5. The only organic acid specifically mentioned in the patent claims is citric acid. *See* Gergely U.S.Patent, col. 4, lines 13–14. However, tartaric acid is mentioned as an organic acid along with citric and malic acids in the background of the invention. *See* Gergely U.S.Patent, col. 1, line 41.

The Gergely patents sought to provide a non-hygroscopic form of L-carnitine that would dissolve rapidly in water and have a pleasant taste.[23] The inventors noted that L-carnitine is highly hygroscopic because it has an internal salt that reacts with acids and causes the hygroscopicity. In the past, L-carnitine was mixed with inert substances to avoid such a reaction. How-

challenged the reduction to practice claim on the basis that Kohl's claims are uncorroborated inventor testimony.

**23.** For ease of reference, the Court will cite only to the Gergely U.S. patent. The parties make no differentiation between the German patent and the U.S. patent, and the two appear substantially similar for purposes of the arguments presented to the Court.

ever, the inert substances would result in too large a volume that was both non-economical and had an "unacceptable" taste. *See* Gergely U.S.Patent, col. 1, lines 17–33. The inventors of the Gergely patents discovered that when L-carnitine comes into contact with organic acids, acid salts are formed which have a lower hygroscopicity than L-carnitine alone. Thus, the invention is based on the premise that if the organic acids combined with L-carnitine could be insulated from the reactive L-carnitine acid salts, the result would be a pleasant tasting compound with little hygroscopity, that dissolves rapidly in water. *See id.* at col. 1, lines 44–57.

The process described in the Gergely patent consists of preparing:

a preliminary solution with organic acid, alkaline earth or alkaline earth metal carbonate, and solvent; applying the preliminary solution onto organic acid crystals; applying a salt onto the acid crystals which have been moistened with the preliminary reactive solution; adding a pulverized coating; drying the coated crystals and adding L-carnitine.

*Id.,* col. 1, line 64– col. 2, line 3.

*Anticipation*

Sigma–Tau claims that if one skilled in the art follows the processes described in the Gergely patents, the results will yield LCLT in the 2:1 molar ratio as described in the '376 patent.[24] Thus, Sigma–Tau argues, the process described in the Gergely patent expressly or inherently describes the claims of the '376 patent. Byrn claims he repeated the disclosure in the Gergely U.S. patent and produced fifteen samples, all of which yielded non-hygroscopic LCLT in the 2:1 ratio. *See* Byrn Decl. ¶¶ 20–27.

Lonza disputes that Byrn did in fact follow the procedure outlined in the Gergely patent. First, Lonza notes the Gergely patent does not specify how much tartaric acid to be used, or if, in fact, tartaric acid should be used. The Gergely patent mentions organic acids generally and citric acid specifically. A reference to tartaric acid is made in the description of the patent. There are no examples to be followed. Thus, tartaric acid is one of many organic acids that could be used to follow the Gergely patent.[25] Byrn claims that because the patent specifies only the amounts of L-carnitine to use, he varied the amounts of carnitine and tartaric acid and, in each instance, a molar ratio of 2:1 resulted.[26]

Goldberg notes the Gergely patent could not have been followed because the patent

24. However, it is unclear if the product produced by following the Gergely patents would meet the specifications of the '376 patent. The product produced in the '376 patent is capable of being processed into tablets, capsules, or powder for oral use. The Gergely patent describes an "effervescent granulate." *See* Gergely U.S. patent, col. 4, lines 21–22. It is unclear if there are varying forms of LCLT such that material that can be used in an effervescent granulate is the same material that can be placed into capsules or tablets. In connection with a prior motion to dismiss for lack of subject matter jurisdiction, the parties disputed whether the preparation for oral application described in the '376 patent covered only the raw material LCLT (*i.e.,* powder), or whether it covered the raw material combined with the ability to further process it into oral dosages (*i.e.,* tablets and capsules). *See Sigma–Tau Industrie Farmaceutiche Riunite, S.p.A. v. Lonza, Ltd.,* 36 F.Supp.2d 26 (D.D.C.1999). Sigma–Tau argued the '376 patent covers "any quantity of [LCLT] which can be taken orally, without restriction as to amount, package form or dose." *Id.* at 31. Lonza argued "the invention was not the creation of the powder itself but the ability to provide a form of powder that was ready for oral ingestion." *Id.* The Court did not resolve the matter. Thus, it is unclear if the alleged LCLT produced by copying the Gergely patent would disclose every element of the '376 patent, including the oral application requirements. The parties have only indirectly addressed the issue in their summary judgment briefs.

25. Lonza notes there are thousands of organic acids. See Opp. to Mot. for Summ.J. at 5. The parties do not dispute that tartaric acid is an organic acid.

26. Byrn does not state why he chose the ratios he did or whether somebody skilled in the prior art would use those same ratios when practicing the Gergely patent.

90

is designed to avoid a reaction between the organic acid and the L-carnitine and Byrn acted to the contrary by reacting the two substances. According to Goldberg, "Byrn's product was a reaction between L-carnitine and L-tartrate, whereas the Gergely patents do not react L-carnitine and L-tartrate." Goldberg Decl. at ¶ 15. Byrn claims the Gergely patent does not teach to physically separate the organic acid from the L-carnitine. *See* Byrn June Decl. at ¶ 6. If the L-carnitine and organic acids were separated, Byrn argues, the L-carnitine would remain hygroscopic. *See id.* However, Byrn does not distinguish between L-carnitine salts and L-carnitine. The Gergely patent notes that when "L-carnitine comes into contact with organic acids [like tartrate] acid salts are formed." Gergely Patent, col. 1, lines 44–45. And, if these acid salts are allowed to "continue to react with the organic acid" a much more hygroscopic compound will be created. *See* Gergely patent, col. 1, 47–50. The Court needs a better record to determine, as a legal matter, whether one skilled in the art would read the Gergely patent as teaching the separation of the L-carnitine from its salts. And, if the Gergely patent is so interpreted, there remains a dispute as to whether the Gergely teaching could produce the compound claimed in the '376 patent, which consists of "the *salt* of L-carnitine with L-tartaric acid in the molar ratio of 2:1." *See* '376 Patent, col. 1, lines 51–53 (emphasis added).[27] Summary judgment is therefore denied on the issue of whether the '376 patent is invalid as being anticipated and described in the Gergely patents.

### V. Conclusion

For the reasons stated, it is hereby

ORDERED that plaintiffs' motion for summary judgment on the ground that the '376 patent is unenforceable for inequitable conduct is hereby denied; and it is

FURTHER ORDERED that plaintiffs' motion for summary judgment on the ground that the '376 patent is invalid for failure to disclose the best mode is hereby denied; and it is

FURTHER ORDERED that plaintiffs' consolidated motion for summary judgment on the grounds that the '376 patent is invalid under 35 U.S.C. § 102(b) and (e) is hereby denied; and it is

FURTHER ORDERED that a status conference shall be held in this matter on **September 29, 1999 at 9:00 a.m.**

IT IS SO ORDERED.

---

**27.** The Court notes that neither Goldberg nor Lonza attempted to perform independent testing to prove or disprove Byrn's theory that following Gergely would result in the formation of LCLT in the 2:1 ratio.